UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRIAN ZURO, et al.,<br>　　　Plaintiff,<br><br>　　　v.<br><br>TOWN OF DARIEN, et al.,<br>　　　Defendant. | No. 3:18-cv-1691 (SRU) |

## RULING ON MOTIONS TO DISMISS

Brian Zuro, Sarah Zuro, and their child, Charles Zuro (collectively, "Plaintiffs") have brought the instant action against the Town of Darien; the Darien Board of Education and several of its former and current members; the Darien Athletic Foundation, Inc. and several of its members and officers; employees and agents of the Darien Public Schools, including the former Superintendent and the Darien High School football coach; an editor of the *Darien Times* and the Hersam Acorn Newspapers, LLC (d/b/a the *Darien Times*); a reporter for the Stamford *Advocate* and the Hearst Media Services Connecticut, LLC (d/b/a the Stamford *Advocate*); and Nancy Trifone Ferrarese (collectively, "Defendants").

The suit arises out of alleged harassment and defamation that followed Sarah and Brian Zuro's efforts to secure adequate special education services for their children. The complaint asserts violations under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, defamation, assault, and battery.

Currently before the court are seven motions to dismiss Plaintiffs' second amended complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), as well as four special motions to dismiss brought under Connecticut's recently enacted anti-SLAPP statute, Conn. Gen.

Stat. § 52-196a. *See* Doc. Nos. 104, 107, 108, 109, 110, 112, 113, 114, 115, 116, 127. For the reasons that follow, I **deny** the special motions to dismiss and **grant** the Rule 12(b) motions.

I. **Standard of Review**

   A. Rule 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The party seeking to invoke a court's jurisdiction bears the burden of establishing such jurisdiction. *Thompson v. Cnty. of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994) (citing *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

"[T]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff," but "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal citations omitted). In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court may refer to evidence outside the pleadings. *Makarova*, 201 F.3d at 113.

   B. Standard of Review under Rule 12(b)(6)

A motion to dismiss for failure to state a claim under Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (quotation marks omitted).

## II. Background

### A. Factual Allegations[1]

Sarah Zuro was elected as a member to the Darien Board of Education ("the Board") in 2012. Am. Compl., Doc. No. 101, at ¶ 4. Her younger child ("Sibling 1") had been receiving inadequate special education services from the Darien Schools, and in the spring of 2015, Sibling

---

[1] The facts are drawn from the complaint, and for purposes of the present motions, I assume them to be true and draw all reasonable reference in Plaintiffs' favor. *See Ashcroft*, 556 U.S. at 678–79.

1's planning and placement team – which comprised of school personnel, Sarah Zuro, and her husband, Brian Zuro – determined that Sibling 1 required additional and different services in order to obtain the education to which Sibling 1 was entitled. *Id*. Sarah and Brian Zuro advocated for an out-of-district placement for Sibling 1, and the planning and placement team ("PPT") eventually agreed and made the placement. *Id*.

On June 2, 2015, Robert Trifone, the Darien High School's ("DHS") head football coach, wrote an email to several Darien residents about a meeting earlier that day between Trifone and Chris Manfredonia, the Darien Athletic Director. *Id.* at ¶ 40; Ex. A to Am. Compl., Doc. No. 101. In that email, Trifone "lamented the financial controls and limitations that had been put in place by the Board." *Id.* He stated that "Chris is also worried that [Sarah Zuro] is on the Bd of Ed and does not want her (or anyone else for that matter) to question exactly how the money is raised." *Id*. Trifone then proposed, "perhaps we deal in a little more cash than checks and just hold some back." *Id*. at ¶ 40. The email was forwarded to Peter Graham, President of the Darien Athletic Foundation, who replied that "[Zuro] is an issue" and offered to "arrange to 'wash' the money through the Darien Junior Football League in order to avoid being discovered by Sarah Zuro, and to give Trifone complete control over those Board and Town assets." *Id*. at ¶ 41.

In July 2015, Daniel Brenner was appointed as Superintendent of the Darien Public Schools. *Id*. at ¶ 35. Shortly after his appointment, he learned about Sibling 1's out-of-district placement and grew "incensed that a Board member had a child who was placed out of district at the expense of the Darien Schools." *Id*. In retaliation, he "initiated a campaign to marginalize Sarah Schneider Zuro in the eyes of fellow Board members and District personnel in an effort to drive Sarah Schneider Zuro off the Board." *Id*. Toward that end, "[w]hen the opportunity presented itself, Brenner acted in the nature of a 'cat's paw' to foster the grievances against

4

Sarah Zuro held by DAF members, other Board of Education members, school personnel and community members, and used them to help him succeed in his campaign against Sarah Zuro." *Id*. The "coordinated campaign" also targeted her older son Charles Zuro, who was a Darien High School student at the time and had been enrolled in a special education program. *Id*. at ¶¶ 35, 46.

Over a year later, on September 26, 2016, Brenner – in furtherance of his plan – forwarded an email to Michael Harman, then-chair of the Board, that Sarah Zuro had sent to Brenner about "an incident at DHS earlier that day." *Id*. at ¶¶ 36, 37. The email contained sensitive information about Charles's educational program, including his status as a special education student, to which Harman was not entitled. *Id*. at ¶¶ 36, 37. Harman, in turn, relayed the information to other Board members, who likewise were not authorized to receive the information. *Id*. at ¶¶ 36, 37. Brenner forwarded responses to Sarah Zuro's original email to Harman as well. *Id.* at ¶ 38.

Also in the fall of 2016, Elizabeth Hagerty-Ross, a member of the Board, had accessed the educational records of Charles Zuro and Sibling 1, and improperly shared that information with other Board members. *Id*. at ¶ 39.

On October 1, 2016, "the retaliation by Trifone against the Zuro family became physical." *Id*. at ¶ 42. The Darien High School varsity football team, of which Charles Zuro was a member, played a home game against Norwich Free Academy. *Id*. at ¶ 42. A disgruntled opposing player shoved Charles after a play. *Id*. Charles "held up his hands in a 'surrender' position and backed away as the referee and others moved to restrain the opposing player." *Id*. Charles then lined up with his teammates for the next play. *Id*. Trifone, who was coaching the game, "suddenly summoned" Charles off the field; Charles jogged to the sideline, but before he

reached it, Trifone "began screaming at [Charles], walked onto the field, and without justification of any kind, used all the force of his body to hit Charles in the head – all as he was removing his helmet." *Id*. There was an audible "crack," which "caused the stadium spectators to gasp" and left Charles staggering for several yards. *Id*. at ¶¶ 41–42.

Following the game, Trifone told Brian Zuro that Trifone had been instructed not to participate in football activities until the conclusion of an investigation into the incident, which, according to Trifone, was "unacceptable." *Id*. at ¶ 43. Trifone demanded that Brian tell Sarah Zuro to call Brenner and convince Brenner to allow Trifone to return to the field with the team by Monday. *Id*. at ¶ 43. Trifone then stated, "[y]ou have to do that and get me back. Because if anything bad happens to me, it will become really, really bad for Charlie." *Id*. at ¶ 43. Trifone spoke with Sarah afterward, and reiterated that "she needed to call Defendant Superintendent Brenner and get Brenner to re-instate Trifone immediately." *Id*. at ¶ 44. Sarah declined to do so. *Id*.

The next day, on October 2, 2016, Sarah Zuro discussed with Brenner the football game incident and Trifone's threat. *Id*. at ¶ 45. She also raised her concern about possible retaliation and harassment against Charles, and asked Brenner to protect Charles while in school. *Id*. at ¶ 46. Brenner, however, "took this instead as an opportunity to act as a 'cat's paw,' allowing Trifone to abuse Charles Zuro, thus creating intense distress for Sarah Zuro to put pressure on her to leave the Board." *Id*.

Brenner commenced the investigation on October 3, 2016, and several witnesses were interviewed. *Id*. at ¶ 47. After the investigation concluded on October 10, 2016, Brenner falsely told Sarah Zuro that no one had corroborated her version of the incident.[2] *Id*. at ¶ 48. Brenner

---

[2] Plaintiffs claim that a few witnesses, including Allison Keating, an elementary school teacher employed by the Darien Schools, did not report the incident accurately. *Id*. at ¶¶ 51, 52.

stated that he would nonetheless issue a two-week suspension to Trifone retroactively, which meant that Trifone would only miss one game on October 15, 2016.³ *Id*. at ¶ 48. Sarah repeated her concerns about the potential for retaliation against Charles. *Id*. Brenner then informed Brian that a number of people "were organizing to go on the offensive against the Zuro family and in support of Trifone, and that they were already engaging in a letter-writing campaign." *Id*. at ¶ 49. Brian echoed Sarah's concern about their son's safety. *Id*.

That same day, Brenner and the Darien Schools issued a press release that Trifone would be suspended. *Id*. at ¶ 49. Brenner, however, "did not act to protect the Zuro family as required by law and Board policy, but instead continued to act as a 'cat's paw,' now knowing with certainty that vindictive retaliation would be directed at Sarah Zuro and Charles Zuro." *Id*. at ¶ 49. After Brenner gained access to a video that corroborated that Coach Trifone assaulted Charles Zuro without provocation at the football game, Brenner placed Trifone on another suspension. *Id.* at ¶ 73. Brenner informed Trifone that he was being suspended a second time solely because of pressure he was facing from Sarah. *Id*. at ¶ 74

Trifone's suspensions triggered considerable backlash against Sarah and Charles Zuro, including: (1) two letters in support of Trifone signed by former captains and the captains' parents, circulated by Peter Graham, one of which stated that Charles had engaged in an "unsportsmanlike act of taunting," *id*. at ¶ 50; (2) negative social media posts directed at Charles and Sarah, including two posts by Guy Wisinski, a member of the Darien Athletic Foundation's Lights Brigade Committee, *id*. at ¶¶ 54, 92; (3) the deletion of Charles's name and image from the football team's annual yearbook, replaced by an image saying "No Guts No Glory," *id*. at ¶

---

³ Trifone nonetheless coached the October 15, 2016 game from his classroom and from the second floor of the high school's stairwell that overlooked the football field. *Id*. at ¶ 69. Trifone was not disciplined for that behavior. *Id*.

64; (4) the portrayal of Sarah Zuro by Trifone and others as a "crazy," "psycho," and "chooch" mother who forced the school to discipline Trifone without reason, *id*. at ¶ 75; (5) bullying of Charles at school and by adults in the community, *id.* at ¶ 76; (6) Trifone ensuring that Charles was not recognized for his contributions to the football team, *id*. at ¶ 78; and (7) the Darien Schools and Board members maliciously "releas[ing] sensitive and private information regarding Charles Zuro and his family in violation of applicable school policy and FERPA," *id*. at ¶¶ 39, 77.

In addition, Trifone "enlist[ed] conspirators to push a false, defamatory account" of the incident: that Charles was behaving in an out-of-control manner and that Trifone, the benevolent coach, was being unfairly punished for coming to Charles's aid. *Id*. at ¶¶ 56, 61, 62. The false narrative was published in the Stamford *Advocate* on October 10, 2016 by Anthony Parelli, *id*. at ¶¶57-58, and in the *Darien Times* by Sarah Shultz, *id*. at ¶ 59. Coach Trifone's sister, Nancy Trifone Ferrarese, posted on the *Darien Times* website an allegedly defamatory comment, which was drafted by Trifone, *id*. at ¶ 69.

Charles Zuro's scholastic performance declined significantly, and a series of PPT meetings were held as a result. *Id*. at ¶¶ 81, 83, 84. At one PPT meeting in the spring of 2017, the Darien Public Schools "us[ed] the PPT process to retaliate against the Zuros and their son," and announced that Charles could no longer return to DHS for his senior year and instead would be required to attend Weston High School. *Id*. at ¶¶ 84–85. Sarah and Brian Zuro objected to the transfer and, to protect Charles, ultimately decided to enroll him in private school instead. *Id*. at ¶ 88.

Early in the summer of 2017, news got out that Charles would be attending private school that fall, which renewed the bullying. *Id*. at ¶¶ 88–89. Board members then released more

8

"private sensitive information." *Id.* at ¶ 89. After Charles experienced "an extreme and severe emotional crisis," the Darien Schools permitted him to return to DHS and play football. *Id.* at ¶ 89. Overcome with "extreme emotional grief," and concerned about her safety and the safety of her family, Sarah Zuro resigned from the Board in September 2017. *Id.* at ¶¶ 91, 97–99.

Throughout that time, from October 1, 2016 through after Charles Zuro's graduation in June 2018, the Zuros, on numerous occasions, notified Brenner, the Darien Schools, the Board, and its personnel of the bullying directed at Charles. *Id.* at ¶¶ 64, 65, 68, 80, 90, 100. Nonetheless, the defendants failed to take any steps to prevent, report, or investigate any harassment. *Id.* Plaintiffs claim that this failure to act violated a number of Darien Board of Education policies. *Id.* at ¶ 101.

B. Procedural History

On October 11, 2018, Plaintiffs filed the instant action against the Town of Darien; the Board; Michael Harman, Elizabeth Hagerty-Ross, Tara Ochman, and David Dineen (collectively, "Board of Education Defendants"), in their individual and official capacities as members of the Darien Board of Education; Daniel Brenner, in his individual and official capacity as former Superintendent of the Darien Public Schools; Robert Trifone, James Thaddeus Keating, Allison Keating, Christopher Manfredonia, Mitchell Ross, and Gregory Doll (collectively, "Darien School Defendants"), in their individual and official capacities as employees and agents of Darien Public Schools; Darien Athletic Foundation, Inc.; Peter Graham, Mark Maybell, Guy Wisinski, Jennifer Montanaro, Susan Graham, Susan Hamill, and Lou Geualdi (collectively, "Darien Athletic Foundation Defendants"), in their individual capacities as members and officers of the Darien Athletic Foundation and/or the Darien Lights Brigade Committee of the Darien Athletic Foundation; Hersam Acorn Newspapers, LLC; Susan Shultz in her official capacity as

an editor of the *Darien Times*; Hearst Media Services Connecticut, LLC; Anthony Parelli in his official capacity as a reporter for the Stamford *Advocate*; and Nancy Trifone Ferrarese. *See* Compl., Doc. No. 1, at 1. An amended complaint was filed on February 22, 2019, doc. no. 92, and a second amended complaint – the operative complaint – was filed on March 15, 2019, doc. no. 101.

The second amended complaint seeks compensatory and punitive damages, and asserts the following causes of action:

> I. Deprivation of rights under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., and Section 504 of the Rehabilitation Act of 1973, 42 U.S.C. § 701, et seq., against (1) the Board; (2) Board of Education Defendants, (3) Brenner; (4) Trifone; (5) Manfredonia; and (6) the Darien High School football Chaplain Gregory Doll;
>
> II. Intentional infliction of emotional distress, against (1) the Board; (2) Board of Education Defendants; (3) the Darien Athletic Foundation; (4) Darien Athletic Foundation Defendants; (5) Brenner; (6) Trifone; and (7) Darien School Defendants;
>
> III. Negligent infliction of emotional distress, against (1) Board of Education Defendants; (2) Darien School Defendants; (3) Trifone; and (4) Brenner;
>
> IV. Negligence, against (1) the Board; (2) Board of Education Defendants; (3) Trifone; (4) Brenner; (5) the Darien School Defendants; (6) Peter Graham; (7) Susan Graham; (8) Susan Hammil; and (9) Nancy Trifone Ferrarese;
>
> V. Defamation, against (1) Hersam Acorn Newspapers, Hearst Media Services Connecticut, Susan Shultz, Anthony Parelli (the "Media Defendants"); (2) Trifone; and (3) Ferrarese;
>
> VI. Assault and Battery, against Trifone.

Am. Compl., Doc. No. 101, at 32–58.

Defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) and for lack of subject

matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).[4] Nine defendants – Wisinski, the Darien Athletic Foundation, Peter Graham, Susan Graham, Hamill, Hearst Media Services Connecticut, Parelli, Hearst Acorn Newspapers, and Shultz – have also filed special motions to dismiss under Connecticut's anti-SLAPP statute, Conn. Gen. Stat. § 52-196a. *See* Mots. to Dismiss, Doc. Nos. 109, 110, 113, 115.

**III.  Discussion**

A. Retaliation Claim under the ADA and Section 504 of the Rehabilitation Act[5]

The Board, Superintendent Brenner, Athletic Director Manfredonia, and all Board Members, as well as Chaplain Doll and Coach Trifone in separately-filed motions, move to dismiss the first count. *See* Mots. to Dismiss, Doc. Nos. 104, 116, 127. They contend, *inter alia*, that the first count fails to state a claim under the Americans with Disabilities Act ("ADA") or Section 504 of the Rehabilitation Act of 1973 because Plaintiffs do not adequately allege retaliation on the basis of a disability.[6] I agree.

The ADA and Section 504 of the Rehabilitation Act prohibit disability-based discrimination, and, in pertinent part, proscribe retaliation against any individual for opposing any act or practice that the statutes render unlawful. *See* 42 U.S.C. § 12203(a); 29 U.S.C. § 794(d). A plaintiff claiming retaliation under the ADA or Section 504 must make a *prima facie* case establishing the following elements: (1) the plaintiff "was engaged in protected activity;" (2) "the alleged retaliator knew that the plaintiff was involved in protected activity;" (3) "an adverse decision or course of action was taken against plaintiff;" and (4) "a causal connection

---

[4] All defendants moved to dismiss except Nancy Trifone Ferrarese, who has not yet appeared in this action.
[5] Because Plaintiffs have clarified that their complaint does not allege a claim of discrimination against Defendants, I do not address Defendants' arguments relating to discrimination under the ADA or Section 504.
[6] To the extent Doll has not propounded that particular argument in his briefs, I *sua sponte* consider the argument with respect to Doll.

11

exists between the protected activity and the adverse action." *Weixel v. Bd. of Educ. of New York*, 287 F.3d 138, 148–49 (2d Cir. 2002) (internal citations omitted); *see also Burgess,* 346 F. App'x at 660 ("The elements of a retaliation claim under the Rehabilitation Act are the same as the Americans with Disabilities Act . . . .") (internal citations omitted).

In the present case, the complaint alleges several forms of retaliation spearheaded by Brenner. In particular, the complaint states that "[i]n an effort to force Sarah and Brian Zuro to terminate their son's out-of-district placement and/or to punish them for obtaining that legal and appropriate remedy for their child, Defendant Brenner enlisted the[] Town Board of Education Defendants, as well as the other school employee Defendants, the Darien Athletic Foundation Defendants . . . and others, to engage in a wide-ranging pattern of retaliation against Sarah Zuro . . . and Charles Zuro." Am. Compl., Doc. No. 101, at ¶ 108.

To that end, the following actions were allegedly committed: (1) Brenner and other defendants improperly disseminated "sensitive" and "private" information about Charles to Board members, *id.* at ¶¶ 36–39; (2) Brenner falsely stated that no one corroborated Sarah Zuro's description of Trifone's assault of Charles and that Trifone's second suspension was solely a result of pressure from Sarah, *id.* at ¶¶ 48, 74; (3) the Board of Education Defendants, Brenner, and other school personnel failed to take measures to protect Charles from the ongoing bullying and harassment, in spite of their alleged legal obligation to do so, *id.* at ¶¶ 49, 54, 64, 79–80, 100; and (4) Brenner refused to take sufficient disciplinary action against Trifone for his conduct at the October 1, 2016 football game and against the individuals who allegedly lied during the investigation of the game incident, *id.* at ¶¶ 69–73. In addition, Trifone concocted and disseminated an allegedly false and defamatory account of what transpired at the football game. *Id.* at ¶¶ 55–56.

I cannot discern from the complaint any causal connection between those acts and the Zuros' efforts advocating for their children's educational needs. A plaintiff alleging retaliation may establish a causal connection either directly or indirectly. *Genn v. New Haven Bd. of Educ.*, 219 F. Supp. 3d 296, 323 (D. Conn. 2016) (internal citations omitted). "Direct evidence of retaliatory animus directed towards a plaintiff is sufficient to show a causal connection." *Id.* (citing *DeCintio v. Westchester County Center*, 821 F.2d 111, 115 (2d Cir. 1987)). Indirect evidence can be established by demonstrating that the "protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of [others similarly situated] who engaged in similar conduct." *Id.* (quoting *DeCintio*, 821 F.2d at 115). Claims premised on temporal proximity between the retaliation and protected activity must allege temporal proximity that is "very close" in time. *Perry v. NYSARC, Inc.*, 424 F. App'x 23, 26 (2d Cir. 2011) (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)).

Plaintiffs offer no such allegations in their complaint. First, Plaintiffs make "no allegations that [Defendants] articulated a retaliatory animus when undertaking the activities" at issue. *Genn*, 219 F. Supp. 3d at 323. For example, the complaint is devoid of allegations that Brenner expressed disapproval of Sarah or Brian Zuro's advocacy when Brenner forwarded the e-mail containing information about Charles's educational program to Harman, or when he declined to take steps to address complaints about the bullying against Charles. The allegation that Brenner "repeatedly expressed his hostility to those who advocated for special education services, specifically disapproving of students going to out-of-district placements and claiming parents sought special education eligibility for the sole purpose of getting extended time on SATs" fails to cure that defect. Am. Compl., Doc. No. 101, at ¶ 109.

13

Moreover, the premise of Plaintiffs' retaliation argument – that Brenner was outraged by the Zuros' advocacy for their children's education – is facially implausible. The complaint is bereft of factual support for the allegation that Brenner was "incensed" by such efforts. *Id*. at ¶ 35. Despite my repeated requests during the hearing for additional facts, Plaintiffs' counsel could only muster one allegation: that Brenner, at an unspecified time, told other board members within Sarah Zuro's hearing that he was upset about the cost of Sibling 1's outplacement. That singular comment does not permit me to "draw the reasonable inference that the defendant is liable for the misconduct alleged," particularly when the gravamen of the complaint – the sprawling conspiracy orchestrated by Brenner – is based on Brenner's alleged outrage. *Ashcroft*, 556 U.S. at 678 (internal citations omitted).

Second, there are no allegations that Brenner, the Board, the Board of Education Defendants, Trifone, Manfredonia, or Doll "treated other [p]arents and [s]tudents in similar situations differently." *Genn*, 219 F. Supp. 3d at 323.

Finally, there is no "particular connection in time between [Sarah or Brian Zuro's advocacy] and the actions discussed above." *Id*. Sarah and Brian Zuro's initial advocacy for an out-of-district placement took place in the spring of 2015, and Brenner learned of such placement "shortly after" his appointment to the Darien Public Schools' Superintendent position in July 2015. The first alleged adverse action – Brenner's forwarding of an email with confidential information – occurred on September 26, 2016, over a year later.

Although the complaint alleges that, each school year, the Zuros complained about the Board's noncompliance with federal requirements and advocated for accommodations for Charles, doc. no. 101, at ¶ 109, the complaint does not specify when such complaints or advocacy occurred. At the hearing, Plaintiffs' counsel stated that an IEP meeting took place for

14

Sibling 1 in June 2016, during which the Zuros requested continued outplacement for their child. Those requests were met with disapproval, and were allegedly documented in the meeting minutes. *Id*.

As a preliminary matter, there is no allegation that Brenner attended that particular meeting or was aware of the Zuros' advocacy at the meeting. Even if he was, the temporal proximity between the meeting and Brenner's first adverse action on September 26, 2017 is not sufficiently "very close in time" to support a minimal inference of discriminatory intent. *Perry*, 424 F. App'x at 26 (quoting *Clark County Sch. Dist.*, 532 U.S. at 273–74); *Hollander v. Am. Cyanamid Co.,* 895 F.2d 80, 82, 85 (2d Cir. 1990) (holding that a three and a half-month interval between protected activity and alleged retaliation was insufficient to demonstrate a casual nexus).

The federal claims against Trifone, Doll, and Manfredonia fail for the additional reason that Plaintiffs have not sufficiently alleged that those defendants knew about the Zuros' advocacy for their children's educational rights. Brian Zuro's declaration, which accompanied the memorandum in opposition to Doll's motion to dismiss, states that Doll was present at the football game, witnessed the bullying that followed, and yet "did nothing" to stop the harassment.[7] *See* Mem. in Opp. to Mot. to Dismiss, Doc. No. 141-1, at 1. That declaration, however, does not assert that Doll was aware of Sarah and Brian's efforts to further their children's education.

---

[7] Doll argues that I should not consider the facts asserted in the declaration. Def.'s Rep. to Pl.'s Res. to Mot. to Dismiss, Doc. No. 147, at 2–3. That argument has merit. *See Mercer v. Schriro*, 337 F. Supp. 3d 109, 123 (D. Conn. 2018) ("[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material.") (internal quotation marks omitted) (*quoting Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000)). I need not resolve that question here, however, because the declaration is immaterial regardless.

With respect to Trifone, the allegation that he was "well-aware of Defendant Brenner's campaign against Sarah Zuro and co-opted Brenner's efforts to satisfy his own personal goals" similarly does not suffice. Am. Compl., Doc. No. 101, at ¶ 40. Nor does the allegation that "Trifone, for his part, assaulted and battered Charles Zuro on the pretext that he was acting out on the football field in a manner that would have been typical of Charles Zuro's disability." *Id*. at ¶ 109.

Those defects render this case analogous to *Eskenazi-McGibney v. Connetquot Central School District*, 84 F. Supp. 3d 221 (E.D.N.Y. Feb. 6, 2015). In that case, parents of a learning-disabled student brought claims under the ADA and Section 504 against a school district and district employees after the school failed to take steps to address the bullying that was being directed against their child. *Id*. at 224–28. The court dismissed the case, reasoning that "the amended complaint, while replete with alleged instances of bullying of JEM by a fellow student and bus driver, is devoid of any allegation that the bullying was based on JEM's disability." *Id*. at 232. The court observed that "[a] plaintiff . . . does not state a claim under the ADA and Section 504 absent some factual allegation linking the disability and the bullying." *Id*. at 233.

Plaintiffs urge the court to apply a "cat's paw" theory of liability. Mem. in Opp. to Mot. to Dismiss, Doc. No. 128, at 14. A "cat's paw" theory "refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) (internal citation omitted); *Natofsky v. City of New York*, 921 F.3d 337, 350 (2d Cir. 2019) ("Under a Cat's Paw theory of liability, a discriminatory motive may be imputed to a final decision-maker if the decision-

maker's adverse employment action was proximately caused by a subordinate who had a discriminatory motive and intended to bring about the adverse employment action.").

Plaintiffs specifically argue that the cat's paw theory applies because Brenner, who harbored retaliatory intent, "manipulated the rest of the Darien Defendants and Defendant Trifone to encourage their personal animus toward Sarah Zuro, all to achieve the goal of coercing Sarah Zuro into resigning from the Board of Education." Mem. in Opp. to Mot. to Dismiss, Doc. No. 128, at 15 (emphasis omitted). The Second Circuit has not yet addressed whether the cat's paw theory applies to claims brought under the ADA or Section 504. Rather, the cat's paw theory has thus far been applied to a limited number of distinct statutes. *See, e.g.*, *Staub v. Proctor Hosp*, 562 U.S. 411, 422 (2011) (approving application of the cat's paw theory to the Uniformed Services Employment and Reemployment Rights Act); *Vasquez v. Empress Ambulance Serv., Inc.,* 835 F.3d 267, 272–73 (2d Cir. 2016) (holding that "the 'cat's paw' theory may be used to support recovery for claims of retaliation in violation of Title VII"). Moreover, district courts within this circuit have indicated that the cat's paw theory does not apply to the Rehabilitation Act because, unlike Title VII cases, the Rehabilitation Act requires a stricter but-for causation analysis. *See Natofsky v. City of New York*, 2017 WL 3670037, at *12 (S.D.N.Y. Aug. 8, 2017), *aff'd on other grounds*, 921 F.3d 337 (2d Cir. 2019).

I decline to decide whether the cat's paw theory applies in the ADA or Rehabilitation Act context because the complaint sets forth no allegations supporting the theory's application to this case in any event. In *Vasequez v. Empress Ambulance Serv., Inc*, the Second Circuit held that Empress, the plaintiff's former employer, was liable under the cat's paw theory when Empress terminated the plaintiff's employment in negligent reliance on false accusations of sexual harassment brought by a low-level employee who was acting out of retaliatory intent. 835 F.3d

17

267, 275 (2d Cir. 2016). The Court concluded that, as a result of Empress's negligence, the employee achieved a "'meaningful,' and indeed decisive, role" in the plaintiff's termination. *Id.*

In contrast, here, Plaintiffs have failed to state that Brenner played a part – much less a meaningful one – in any of the other defendants' actions. For example, Plaintiffs have failed to sufficiently plead that Brenner served a meaningful role in the Board of Education Defendants' decision to release "sensitive and private information" regarding the Zuros, in Trifone's decision to push a defamatory account of the October 1, 2016 football game, or in the Board's failure to intervene in the bullying. During the hearing, Plaintiffs relied heavily on Brenner's comment to Trifone in October 2016 that Sarah Zuro was responsible for Trifone's second suspension. But Plaintiffs have not cited any facts indicating how that comment influenced Trifone's subsequent actions – specifically, Trifone's refusal to grant Charles leadership opportunities or nominate Charles for any awards. Accordingly, the factual basis necessary to support a cat's paw theory does not exist here.

In sum, "[c]laims of general harassment are not cognizable under the ADA [or] section 504." *Eskenazi-McGibney*., 84 F. Supp. 3d at 238. For the foregoing reasons, and because the proposed amendments would fail to cure the instant complaint's deficiencies, the first count is **dismissed with prejudice.**

B. State Law Claims

"The exercise of supplemental jurisdiction is within the sound discretion of the district court." *Lundy v. Catholic Health Sys. of Long Island Inc*., 711 F.3d 106, 117 (2d Cir. 2013) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349–50 (1988)). In determining whether to exercise such jurisdiction, courts consider "the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise supplemental jurisdiction." *Id*.

(citing *Carnegie Mellon Univ.*, 484 U.S. at 350). When "all federal claims have been dismissed, the balance of factors will 'usual[ly]' point toward a declination." *Id.* (citing *Carnegie Mellon Univ.*, 484 U.S. at 350 n.7).

Here, because all of the federal claims have been dismissed early in the action, I decline to exercise supplemental jurisdiction over the remaining state law claims. *See, e.g., Eskenazi-McGibney v. Connetquot Cent. Sch. Dist.*, 84 F. Supp. 3d 221, 238 (E.D.N.Y. 2015) ("In light of the dismissal of all federal claims early in this action, and upon consideration of all relevant factors, namely judicial economy, convenience, fairness and comity, insofar as the amended complaint may be deemed to state any cognizable claims under state law, the Court declines to exercise supplemental jurisdiction over such claims."). For that reason, I also decline to rule on the merits of the special motions to dismiss brought under Conn. Gen. Stat. § 52-196a. Those motions are denied without prejudice.

## IV. Conclusion

For the foregoing reasons, the motions to dismiss (doc. nos. 104, 107, 108, 112, 114, 116, 127) are **granted** and the amended complaint is dismissed. The Plaintiffs' state law claims are **dismissed without prejudice** to refiling in state court. The special motions to dismiss (doc. nos. 109, 110, 113, 115) are **denied** without prejudice. The Clerk is directed to enter judgment in favor of the defendants on the first count and close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 10th day of January 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge